1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California  90067
Telephone: 310.552.5000
Facsimile: 310.552.5001

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Zachary T. Timm (SBN 316564)
Zachary.Timm@klgates.com

*Attorneys for Plaintiff CBRE, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CBRE, INC., a Delaware corporation;<br><br>     Plaintiff,<br><br>     v.<br><br>ZACHARIAH BOWYER, an individual;<br>BENNETT C. JOHNSON, an individual;<br>BRYAN LOCKARD, an individual; PAUL K.N. FOMENKY, an individual;<br>CORINNE AUSTIN, an individual;<br>PAIGE AVERY, an individual;<br>LIZETTE CANNARELLA, an individual;<br>JEFFREY COLTON, an individual;<br>KALEIGH JONES, an individual;<br>SERENA LIPTON, an individual;<br>JAMES PALAC, an individual;<br>ADIB SARKIS, an individual;<br>KELLY SUNDAY, an individual;<br>and DOES 1 through 10 inclusive,<br><br>     Defendants. | Case No. 2:19-cv-9108<br><br>**COMPLAINT FOR:**<br><br>**(1) MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836);**<br>**(2) MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code §§ 3426, *et seq.*);**<br>**(3) BREACH OF CONTRACT;**<br>**(4) INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS;**<br>**(5) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Civ. Code §§ 17200, *et seq.*)**<br>**(6) INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>**(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**<br>**(8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; AND**<br>**(9) VIOLATION OF COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)**<br><br>**DEMAND FOR JURY TRIAL** |

1

**COMPLAINT**

Plaintiff CBRE, Inc. ("CBRE" or "Plaintiff"), complains and alleges as follows:

## STATEMENT OF THE ACTION

1. In this action, CBRE seeks relief from the damage caused by, and to prevent irreparable harm from, a nefarious plot by a former Senior Managing Director, his team, and associates who conspired to steal CBRE's trade secrets and confidential/proprietary data, and interfere with its business, so that they can unfairly compete with CBRE at their new employer, Johns Lang LaSalle ("JLL").

2. This covert and deliberate scheme to steal from California-based CBRE, and trade off of its decades of hard work and investments to develop its trade secrets was led by its former Managing Director of Valuation and Advisory Services, Zachariah Bowyer ("Bowyer"). Bowyer conspired with his team and associates to take CBRE's valuable property and use it for their benefit at their new employer. These team members and associates include Bennett C. Johnson ("Johnson"), Paul K. N. Fomenky ("Fomenky"), Bryan Lockard ("Lockard"), Corinne Austin ("Austin"), Paige Avery ("Avery"), Lizette Cannarella ("Cannarella"), Jeffrey Colton ("Colton"), Kaleigh Jones ("Jones"), Serena Lipton ("Lipton"), James Palac ("Palac"), Adib Sarkis ("Sarkis"), and Kelly Sunday ("Sunday") (together with Bowyer, "Defendants").

3. In the weeks and months leading up to their resignations from CBRE, Defendants collectively downloaded tens of thousands (if not more) of files from CBRE's systems containing CBRE's valuable confidential, proprietary, and trade secret information, which included CBRE templates, property information, client data, financials, bulk market data, subscription market data, CBRE valuation technology not related to the senior housing appraisal, databases with large numbers of properties, CBRE employee data, CBRE credentials to data subscriptions, individual components of CBRE technology, and other important files.

4. Shockingly, some of the Defendants continued to download files from CBRE's systems in the days and weeks *after* their resignations.

2

**COMPLAINT**

5.      Defendants also appear to have secreted and/or deleted some of CBRE's valuable confidential, proprietary, and trade secret information from CBRE's systems to prevent CBRE from using its own property, while Defendants continued to use that stolen property.

6.      Defendants also engaged in other suspicious activity that violated CBRE policy, including, uploading files to non-sanctioned file-sharing sites, using a file-snipping tool to take unlogged screen captures, using USB flash drives, and sending emails with CBRE's confidential, proprietary, and trade secret data to personal, non-CBRE email addresses.

7.      Defendants also appear to have downloaded materials from CBRE's Box.com account using what appear to be non-CBRE IP addresses, which could suggest that the files were downloaded to Defendants' personal and/or non-CBRE devices. CBRE's investigation into this and other issues is ongoing.

8.      Defendants have also interfered with CBRE's business relationships, including through deceiving CBRE's clients and attempting to intimidate CBRE's employees.  For example, CBRE's clients have told CBRE that some of the Defendants told them at a recent industry conference that CBRE no longer had the ability to provide valuation and appraisal services relating to Seniors Housing in the wake of Defendants' departures.  In another example, Bowyer tried to intimidate CBRE employees to get them to stop contacting *CBRE's own clients*, presumably so that Bowyer and his team could continue to solicit them unimpeded using CBRE's confidential, proprietary, and trade secret information.

9.      By way of this action, CBRE seeks to immediately stop Defendants' use of CBRE's confidential, proprietary, and trade secret information, retrieve all such information from Defendants, forensically analyze all of Defendants' devices and accounts (at Defendants' cost) to determine how they have used, disclosed, and transferred CBRE's property, forensically delete such information from all of

**COMPLAINT**

Defendants' devices and accounts (at Defendants' cost), and recover damages and other relief for the harm Defendants have already caused.

10.     After the filing of this Complaint, CBRE will promptly seek a temporary restraining order and preliminary injunction.  After the Court resolves CBRE's request for preliminary relief, CBRE may seek to compel Defendants to arbitrate CBRE's claims pursuant to the parties' arbitration agreements.

## THE PARTIES

11.     CBRE is a corporation organized under the laws of the State of Delaware with its principal place of business at 400 South Hope Street, Los Angeles, California 90071.

12.     On information and belief, Defendant Bowyer is a citizen of Massachusetts residing at 345 Harrison Avenue, Apartment 355, Boston, Massachusetts 02118. Bowyer worked in CBRE's Boston office and resigned from CBRE on August 13, 2019, to join CBRE's competitor JLL.

13.     On information and belief, Defendant Johnson is a citizen of California residing at 416 South Spring Street, Apartment 606, Los Angeles, California 90013. Johnson worked in CBRE's Los Angeles office and resigned from CBRE on August 9, 2019, to join CBRE's competitor JLL.

14.     On information and belief, Defendant Lockard is a citizen of Illinois residing at 340 West Ross Avenue, Apartment 127, Tampa, Florida 33602.  Lockard worked in CBRE's Chicago office and resigned from CBRE on August 9, 2019, to join CBRE's competitor JLL.

15.     On information and belief, Defendant Fomenky is a citizen of Massachusetts residing at 16 Victoria Street, Dorchester, Massachusetts 02125. Fomenky worked in CBRE's Boston office and resigned from CBRE on September 6, 2019, to join CBRE's competitor JLL.

16.     On information and belief, Defendant Austin, is a citizen of Massachusetts residing at 6 East Springfield Street, Apartment 4, Boston, Massachusetts 02118.  Austin

4

**COMPLAINT**

worked in CBRE's Boston office and resigned from CBRE on August 30, 2019, to join CBRE's competitor JLL.

17.     On information and belief, Defendant Avery is a citizen of Massachusetts, residing at 59 Cannon Ball Road, Sharon, Massachusetts 02067.  Avery worked in CBRE's Boston office and resigned from CBRE on August 30, 2019, to join CBRE's competitor JLL.

18.     On information and belief, Defendant Cannarella is a citizen of California residing at 656 Douglas Avenue, Oxnard, California 93030.  Cannarella worked in CBRE's Los Angeles office and resigned from CBRE on September 5, 2019, to join CBRE's competitor JLL.

19.     On information and belief, Defendant Colton is a citizen of California residing at 2777 Alton Parkway, Apartment 429, Irvine, California 92606.  Colton worked in CBRE's Newport Beach office and resigned from CBRE on September 4, 2019, to join CBRE's competitor JLL.

20.     On information and belief, Defendant Jones is a citizen of Illinois residing at 446 Circle Avenue, Apartment 1, Forest Park, Illinois 60130.  Jones worked in CBRE's Chicago office and resigned from CBRE on August 13, 2019, to join CBRE's competitor JLL.

21.     On information and belief, Defendant Lipton is a citizen of Massachusetts residing at 170 Greenwood Street, Newton Center, Massachusetts 02459.  Lipton worked in CBRE's Boston office and resigned from CBRE on September 4, 2019, to join CBRE's competitor JLL.

22.     On information and belief, Defendant Palac is a citizen of Illinois residing at 1320 Virginia Avenue, Libertyville, Illinois 60048.  Palac worked in CBRE's Chicago office and resigned from CBRE on August 30, 2019, to join CBRE's competitor JLL.

23.     On information and belief, Defendant Sarkis is a citizen of New York residing at 4132 27th Street, Unit 5C, Long Island City, New York 11101.  Sarkis

worked in CBRE's Boston office and resigned from CBRE on August 30, 2019, to join CBRE's competitor JLL.

24.     On information and belief, Defendant Sunday is a citizen of Massachusetts residing at 19 Whitney Woods Lane, Cohasset, Massachusetts 02025.  Sunday worked in CBRE's Boston office and resigned from CBRE on August 21, 2019, to join CBRE's competitor JLL.

25.     The true names, conduct and capacities of Defendants sued as Does 1 through 10, are presently unknown to CBRE who, therefore sues these Defendants by such fictitious names.  CBRE will include these Doe Defendants' true names and capacities as they are ascertained.  Each of the fictitiously-named Defendants is responsible in some manner, including, *inter alia*, as co-conspirators, aiders, and abettors, and/or agents for the conduct alleged herein and for the injuries suffered by CBRE.

26.     On information and belief, each of the Defendants entered into a conspiracy and scheme to engage in the wrongful conduct alleged in this Complaint, which was knowingly targeted at California-based CBRE.  Two or more of the Defendants agreed to a common design to commit wrongs against CBRE and its interests.  Defendants formed and operated the conspiracy for the purposes of benefitting themselves and to the detriment of CBRE and its interests.  Among the wrongs to be (and that were) committed was the misappropriation of CBRE's trade secrets, unfair competition, interference with business relationships, interference with contracts, and unauthorized access of CBRE's computer systems, causing harm to CBRE.  The details of the conspiracy, wrongful acts, and damage are set forth more fully below.

## JURISDICTION AND VENUE

27.     This action raises federal questions under the Defend Trade Secrets Act, 18 U.S.C. § 1836 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court has original jurisdiction under 28 U.S.C. § 1331.

28.     This Court has supplemental jurisdiction over the related state law claims asserted in this action pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy under Article III of the United States Constitution.  Indeed, the state law claims arise from the same set of operative facts common to the federal claims and the resolution of those claims serves the interests of judicial economy, convenience, and fairness to the parties.

29.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim and the threatened and actual harm to CBRE occurred in this District by reason of Defendants' conduct as alleged below.

30.     Defendants are subject to personal jurisdiction in this Judicial District.

31.     General personal jurisdiction exists over Defendants Cannarella, Colton, and Johnson (one of the leaders of the conspiracy, under Bowyer) because they are citizens of California.

32.     Specific personal jurisdiction also exists over all Defendants because the specific facts that give rise to the conduct alleged in this Complaint took place in this Judicial District, as discussed below.

33.      In particular, Defendants conduct was expressly aimed at CBRE, which is headquartered in California.  Defendants knew that CBRE's headquarters are in California and, thus, would suffer harm from their conspiracy in California.  Defendants' theft of CBRE's trade secrets took place at least in this Judicial District, through the actions of Cannarella, Colton, and Johnson in this Judicial District and their entry into a conspiracy with the other Defendants in this Judicial District.  Additionally, each of the Defendants conspired with the other Defendants to engage in the wrongful conduct alleged below, the harm of which was felt by CBRE in California, where it is headquartered.

34.     Specific personal jurisdiction further exists because all Defendants were employed by CBRE, which is headquartered in California.  All Defendants knew they

**COMPLAINT**

were employed by CBRE, which has its principal place of business in California. Moreover, countless publicly accessible articles and posts clearly identify CBRE as headquartered in Los Angeles, California. All Defendants had substantial contact with CBRE employees in California, including telephone and email correspondence, including the co-conspirators who are citizens of California in furtherance of the conspiracy alleged herein. Defendants accessed CBRE personnel and resources, located in California, to carry out their respective employment responsibilities, as well as their conspiracy as alleged herein.

35. Defendants are further subject to personal jurisdiction in California because they received employment offers from California-based CBRE (which they accepted) and subsequently signed written employment agreements with CBRE containing, *inter alia*, confidentiality provisions, which they have now breached through the conspiracy as described herein, including through acts in California, which they knew would cause harm in California. Accordingly, upon signing agreements with a corporation headquartered in California, Defendants could reasonably assume to be subject to suit in California seeking injunctive relief, given the conduct they have engaged in.

36. Without doubt, CBRE seeking the emergency relief sought in this action against Defendants in a single action in this Judicial District is fair, efficient, and appropriate given that Defendants knowingly engaged in a nationwide conspiracy to steal from and harm CBRE, who is headquartered in California and feels the brunt of the harm from Defendants' conduct in this Judicial District.

## FACTUAL BACKGROUND

37. CBRE is a commercial real estate and investment firm offering a broad range of integrated services. CBRE is a top-ranked real estate company on Fortune's "World's Most Admired Companies" roster, having made the ranking for the seventh year in a row. CBRE has also been named by Forbes as one of the best large employers in America, best employer for women and new graduates, and one of the top companies

for diversity.  CBRE has also been recognized six years in a row as one of the World's Most Ethical Companies by the Ethisphere Institute.

38.   CBRE has also been recognized by local Los Angeles organizations for being a leader in several areas.

39.   CBRE has several business lines, including its Valuation & Advisory Services ("VAS") group, which provides appraisal, valuation, and related services to its clients, including related to the Seniors Housing market.

40.   Bowyer and his team worked in the VAS group and Fomenky aided them.

## CBRE's Trade Secret Information and Company Policies Regarding Confidentiality

41.   CBRE's success in the marketplace is dependent on its reputation and relationship with existing clients, decades of expertise, large international footprint, and its proprietary technology that sets it apart from competitors.  CBRE invests substantial money, time, and effort obtaining and developing client relationships.

42.   Over the years, CBRE has invested significant amounts of money, time, and effort developing its trade secrets, which includes marketing strategy and research, proprietary information, products, forms, applications/software, and solutions used to value properties, which includes the source code for appraisal models; detailed and specific client, pricing, appraisal, market, subscription, and property information; analytics and streamlined deliverables; proprietary valuation technology related to Seniors Housing; CBRE templates including those containing CBRE's proprietary calculation methods; CBRE's property information; other property information; databases and compilations; rent rolls; market-driven reports/studies; customized reports/studies; financials; projections; market data; models and worksheets; proprietary software, applications, and source code, like Property Insights; proprietary formats in

**COMPLAINT**

word processing applications and software; application/software design; proprietary manuals; formulas; and CBRE databases (collectively, "Trade Secrets").

43.    CBRE has devoted millions of dollars in developing and implementing its Trade Secrets, including but not limited to Property Insights, applications/software, customized market-driven digestible reports/studies, and other information.

44.    CBRE employs reasonable efforts to maintain the secrecy of its Trade Secrets and other confidential/proprietary information.  These efforts include using passwords to protect access to sensitive information, using access cards to gain access to the CBRE offices on weekends, restricting the use of external devices to transfer data, restricting the use of non-sanctioned Cloud services, requiring employees to sign confidentiality agreements and acknowledge similar policies, locking certain features of templates to prevent use by third parties, and limiting access to certain CBRE employees and agents on a need to know basis.

45.    CBRE reminded all the individuals who work in CBRE's VAS group of their confidentiality obligations in a March 24, 2017 Memorandum ("2017 Memorandum").  A true and correct copy of the 2017 Memorandum is attached hereto as Exhibit A.

46.    The 2017 Memorandum stated "[u]nder CBRE Global Policy 5.5 (Information Asset Protection), all Information Assets developed by, for, or on behalf of CBRE by any Company employees, contractors, vendors or any other source is owned by and intended for the exclusive use of CBRE and may not be used for any other purpose unless expressly approved in writing by the Senior Manager of the Digital and Technology department and CBRE's General Counsel.  Any information that is learned at or from CBRE is both proprietary and confidential to CBRE and may not be disseminated outside CBRE to clients, vendors, competitors, or others. (US Policy 6.3 [Confidentiality/Non-Disclosure].)."  (Ex. A, p. 2.)

47.    The 2017 Memorandum expressly identified examples of CBRE's proprietary information as including: "Excel Workbooks and all included or supporting

10

**COMPLAINT**

worksheets - including all standard and customized valuation models and supporting worksheets; Word Formats - standard or customized; Demos and Screenshots of our applications, systems and tools – including live WebEx/screen shares, recordings, screenshots, etc. of our applications; 'Data Dumps' or other excessive outputs of our comparable or market data, XML schemas, XML files, Data Standards, Database Schemas, Application code and designs; Descriptions of Systems, Applications and Technical Capabilities including training manuals – only approved marketing collateral should be used; [and] 3rd party market data or reports obtained from CBRE supplied data services." (*Id.*, pp. 2–3.)

48.     The 2017 Memorandum further stated, "[w]hen in doubt, check with Mike Rowland, Executive Managing Director, Central Division & Americas Operations. Remember these assets are valuable and allow CBRE to maintain a competitive edge!" (*Id.*, p. 3.)

49.     CBRE further protects its Trade Secrets and confidential/proprietary information by maintaining a Digital and Technology Policy for Information Asset Protection that applies to all U.S. CBRE employees (including Defendants), who must certify compliance with annually.  A true and correct copy of CBRE's Digital and Technology Policy 5.5 for Information Asset Protection is attached as Exhibit B.  Per the policy, each individual accessing CBRE networks are assigned individual access identifications. (Ex. B, p. 3 at ¶ IV.A.2.a.)  The policy further prohibits the reproduction of confidential information without prior authorization.  When an employee leaves CBRE, access privileges are revoked.  (*Id.*, p. 6 at ¶ IV.D.1.)  The policy further states all information assets developed by, for, or on behalf of CBRE are owned by and intended for the exclusive use of CBRE.  (*Id.*, p. 7 at ¶ IV.E.2.)

50.     Additionally, CBRE maintains a Confidentiality/Non-Disclosure Policy that applies to all U.S. CBRE employees (including Defendants).   A true and correct copy of the Legal Policy 6.3 Confidentiality/Non-Disclosure is attached as Exhibit C.  The policy prohibits CBRE employees from disclosing to third parties "any material

11

**COMPLAINT**

information learned during their engagement with CBRE, including but not limited to financial, business, private or confidential information of CBRE, our employees, vendors and clients or any individual or entity with which CBRE maintains a business relationship. The prohibition shall include disclosure to individuals and others inside or outside of the Company. Confidential information may be used for the purposes for which it is provided but only when authorized and necessary to maintain ongoing business activities properly and effectively." (Ex. C, p. 2 at ¶ II.A.)

51.  CBRE also has a Use of Company Property Policy that was applicable to Defendants as CBRE employees.  A true and correct copy of the Policy 4.2.4 Use of Company Property is attached hereto as Exhibit D.  This Policy requires that all "[e]mployees must return all Company Property that is in their possession or control immediately upon request or when employment ends." (Ex. D, p. 2 at ¶ II.5.) The Policy defines Company Property to include documents and client property.  (*Id.*, p. 2 at ¶ I.) The Policy also prohibits employees from using Company Property to violate any Company policy or compromises Company confidential information. (*Id.*, p. 2 at ¶ II.7.)

52.  CBRE also has an Acceptable Use of Computers Policy 5.9.2 and an Electronic Communications & Acceptable Use of Technology Policy 5.9—both of which were applicable to Defendants as CBRE employees.  A true and correct copy of the Policy 5.9.2 Acceptable Use of Computers and Policy 5.9 Electronic Communications & Acceptable Use of Technology are attached hereto as Exhibit E.

53.  Policy 5.9 explains that "[a]ll users should have no expectation of privacy in connection with the use of CBRE systems or regarding any information created, stored or transmitted by them; and, all information transmitted by, received from or stored in these systems are the sole property of CBRE." (Ex. E, p. 2 at ¶ III.1.)  This Policy provides that "[a]ll employees consent to this policy, and expressly consent to and acknowledge use of Company electronic communications systems and devices are subject to monitoring. If such monitoring reveals possible evidence of illegal activity, the Company may provide the evidence to law enforcement officials. When requested

**COMPLAINT**

by the Company, employees must provide access to any and all CBRE Data or Property which are under their control including providing any and all passwords. This does not preclude the Company from conducting its own searches or investigations." (*Id.*, p. 2 at ¶ III.2.)   This Policy further provides that "[e]mployees must only use Digital & Tech approved technology solutions to store or transmit CBRE or CBRE customer data. This includes cloud based services, software installed on CBRE computers, or other systems or applications that may store or transmit CBRE data." (*Id.*, p. 2 at ¶ III.3.)   This Policy prohibits the "[i]ntroduction of unauthorized software (i.e., screensavers, toolbars, music players, etc.) on computers or the electronic communications system. IT must authorize all software deployed on CBRE devices." (*Id.*, p. 4 at ¶ IV.A.6.)   This Policy also prohibits "[t]he unauthorized exchange or disclosure of or access to proprietary or confidential information, trade secrets or any other privileged, confidential or sensitive information relating to CBRE, a client or the business of either via any method of communication, including the electronic communication systems." (*Id.*, p. 4 at ¶ IV.A.10.) This Policy also prohibits "[p]roviding proprietary information about, or lists of, CBRE employees, customers, e-mail addresses, vendors, or product information to parties outside of CBRE without proper authorization."   This Policy also prohibits "[u]sing USB storage media to write to or store CBRE data or CBRE client data." (*Id.*, p. 5 at ¶ IV.A.16.)   This Policy further prohibits "[t]ransferring CBRE confidential data to unauthorized cloud service providers, hosting Company's, or other systems outside the control of CBRE Digital & Tech." (*Id.*, p. 5 at ¶ IV.A.18.)   This Policy also prohibits "[f]orwarding CBRE email to non-CBRE email accounts." (*Id.*, p. 5 at ¶ IV.A.21.)

54.   A May 21, 2018 post on CBRE's intranet, which was accessible to Defendants as CBRE employees, describes CBRE's commitment to enhancing data protection.   That post is attached hereto as Exhibit F.   In particular, the post describes that CBRE employees would no longer be "able to write to USB storage devices from CBRE managed computers." (Ex. F, p. 2.)   The post goes on to explain that initiatives,

like the ban on USB usage, "are vital to protecting CBRE's brand and preventing data and privacy breaches." (*Id.*, p. 3.)

55.     CBRE further protects its Trade Secrets and other confidential/proprietary information requiring an employee or appraiser who is terminated or resigns from CBRE to return their company-issued laptops and badges and return all CBRE items in their possession, including electronic information.

56.     These steps are reasonable in light of the nature of CBRE's business and the valuation and advisory and real estate field, in particular, where professionals rely on mobile access to information needed to perform their jobs.

57.     CBRE's VAS employment agreements further describe the importance of CBRE's trade secrets and exclusive property including, among other things, "the identity of and information concerning potential or actual clients, and specialized techniques developed or used by CBRE." (*See, e.g.*, Ex. H at ¶ 13.B.)

## Defendants' Misappropriation

58.     Defendants agreed to a common design to misappropriate CBRE's Trade Secrets, as set forth in more detail below.  As a result of the conspiracy, each of the Defendants is liable for the acts of the other.

59.     While working for CBRE and subject to confidentiality and other policies and obligations, Defendants engaged in a bold conspiracy to steal CBRE's Trade Secrets and confidential/proprietary information and take it to CBRE's competitor—JLL—so that they could unfairly compete with CBRE.  Defendants improperly and without authorization downloaded tens of thousands of files (if not more) from CBRE's password-protected Box.com corporate account, OneDrive, and Sharepoint Online. Additionally, Defendants improperly utilized non-sanctioned file-share sites, such as dropbox.com and Google Drive, and used USB devices in violation of CBRE's restrictions on the use of such devices.

60.     While employed to provide appraisal and related services exclusively to CBRE, Defendants used CBRE's emails and computer systems to steal CBRE's Trade

14

**COMPLAINT**

Secrets, solicit its employees and clients, create a competing group at JLL, and use CBRE's Trade Secrets to unfairly compete with CBRE at JLL.

61.     During the 30 days before their respective resignations, Bowyer and his team downloaded nearly 154 GB from CBRE's password-protected Box.com and Sharepoint Online corporate accounts, which included CBRE Trade Secrets and other confidential and proprietary information.

62.     The files downloaded by Defendants from CBRE's systems were built by CBRE over a period of years and included extensive proprietary and client information. Access to the files was password protected.  Retention, disclosure, and transmittal of these and all other files downloaded by Defendants outside of CBRE poses a significant risk to CBRE.  For example, several of the files for a single market would be enough to enable a user to compete directly with CBRE.

63.     Many of the Defendants downloaded CBRE's Trade Secrets on what appear to be non-CBRE IP addresses.  CBRE is currently investigating this issue.

64.     In addition to downloading thousands of proprietary files from CBRE's systems in the weeks leading up to their resignations, during this time Defendants violated other CBRE company policies, which supports the conclusion that they participated in a conspiracy to steal CBRE's Trade Secrets and otherwise harm CBRE.

65.     As of at least July 26, 2019, Sunday knew of Bowyer's plans to leave CBRE and, upon information and belief, she planned to join them at JLL.

66.     Oddly, however, on August 5, 2019, Corey Perona ("Perona"), who is a recruiter at JLL, reached out to certain Defendants who were still working at CBRE: Cannarella, Colton, Palac, Sunday, and Sarkis, even though on information and belief these Defendants had already planned to join Bowyer at JLL at this time.

67.     Also on August 5, 2019, Perona reached out to the following additional individuals who work at CBRE:  James Graber, RJ DeBee, Seve Gunter, Sean Hector, Andy Kepchar, Daniel Lincoln, Nathan Sorensen, and Jack Valenti.

68.     On August 9, 2019, Johnson and Lockard resigned from CBRE to join JLL.

**COMPLAINT**

69.    On August 13, 2019, Bowyer and Jones resigned from CBRE to join JLL.

70.    On August 21, 2019, Sunday resigned from CBRE to join JLL.

71.    On August 30, 2019, Avery, Sarkis, Austin, and Palac resigned from CBRE to join JLL.

72.    On September 4–6, 2019, Lipton, Colton, Fomenky, and Cannarella resigned from CBRE to join JLL.

73.    Upon information and belief, Defendants' staggered resignations were a strategic approach to retaining access to CBRE's confidential, proprietary, and trade secret information so that they could continue to steal such information from CBRE and disclose it to their co-conspirators who had already joined JLL.

74.    Defendants' authorization and permission to access CBRE's systems and use any of CBRE's property terminated upon their resignations from CBRE.

75.    Nevertheless, without CBRE's authorization or consent, some of the Defendants continued to access CBRE's systems and download CBRE's property in the days and weeks after their resignations.

76.    Upon information and belief, Defendants intend to use CBRE's Trade Secrets (and other confidential/proprietary information) to compete with CBRE, usurp its business opportunities, and steal its clients.

77.    On September 17, 2019, CBRE sent letters to Defendants reminding them of their ongoing confidentiality obligations to CBRE, including the obligation not to disclose CBRE's confidential, proprietary, and trade secret information to CBRE's competitors.  True and correct copies of these letters are attached hereto collectively as Exhibit G.

### *Bowyer*

78.    Bowyer joined CBRE in December 2011.  At the time of his resignation on August 13, 2019, Bowyer held the title of Senior Managing Director, VAS, Senior Housing & Healthcare Group, at CBRE.

**COMPLAINT**

79.     Over the course of his tenure at CBRE, Bowyer led a successful VAS team, which included Austin, Avery, Cannarella, Colton, Johnson, Jones, Lipton, Lockard, Palac, Sarkis, and Sunday.  Fomenky assisted Bowyer and his team.  Bowyer used his position to influence his team members and associates.

80.     In connection with his work in the VAS group, Bowyer entered into, executed, and agreed to abide by the terms of the Employment Agreement - Valuation and Advisory Services ("EA-VAS"), dated February 17, 2017.  Bowyer's EA-VAS is attached as Exhibit H.

81.     Pursuant to Bowyer's EA-VAS, CBRE agreed to compensate Bowyer for his work and provide him with certain services.  In return, Bowyer agreed that he "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE.  [Bowyer] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and [Bowyer] agrees to conduct [his] activities and regulate [his] habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. H at ¶ 7.)

82.     The EA-VAS also contains important confidentiality obligations with respect to Bowyer's work for CBRE.  (*Id.* at ¶ 13.)  Under Bowyer's EA-VAS, Bowyer agreed that "[a]ll forms, documents, papers, records, files, computer software, application systems and programs, and other materials prepared or received by [Bowyer] which pertain to CBRE's business including without limitation appraisal reports, all supporting documentation, letters to [Bowyer] and copies of letters sent by [Bowyer] are property of CBRE."  (*Id.* at ¶ 13(A).)

83.     Under Bowyer's EA-VAS, Bowyer further agreed that "[a]ll information, including information in machine readable form (e.g., magnetic disk, magnetic tape, etc.), disclosed to or developed by [Bowyer] during [Bowyer's] employment by CBRE relating to CBRE's business, including without limitation, the identity of and information concerning potential or actual clients, and specialized techniques developed or used by CBRE are trade secrets and the exclusive property of CBRE."  (*Id.* at ¶ 13(B).)

17

**COMPLAINT**

84.     Under Bowyer's EA-VAS, Bowyer further agreed "to maintain the confidentiality of all information referenced in paragraphs 13A and 13B—both during and after [Bowyer's] employment with CBRE." (*Id.* at ¶ 13(C).)

85.     Under Bowyer's EA-VAS, Bowyer further agreed that, with very limited exceptions in paragraphs 13E and F, "any confidential information obtained by [Bowyer] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client." (*Id.* at ¶ 13(D).)

86.     Under Bowyer's EA-VAS, Bowyer further agreed that "[a]ll work product developed by [Bowyer] in connection with the services provided to CBRE shall be deemed 'work made for hire,' and [Bowyer] shall have no proprietary interest or claim in or to any work product developed by the Salesperson pursuant to the EA-VAS. [Bowyer] hereby assigns and agrees to assign to CBRE, its successors, assignees, or nominees, [Bowyer's] right, title and interest, if any, in any patents, trade secrets, trademarks, copyrights, or other proprietary information embodied in or relating to Appraiser's work product under this EA-VAS." (*Id.* at ¶ 13(G).)

87.     Bowyer's EA-VAS and addendums thereto confirm that Bowyer's employment with CBRE was at-will. (*Id.* at ¶ 15.)

88.     In addition to the recited confidentiality and non-solicitation obligations contained in Bowyer's EA-VAS, Bowyer was required to certify yearly that he acted in accordance with CBRE's Standard of Business Conduct ("SOBC"). A true and correct copy of CBRE's 2019 SOBC is attached hereto as Exhibit I. The SOBC instructs professionals, in part: "Do not share confidential information even within CBRE unless you are sure that the recipient has the need to know that information." (Ex. I, p. 40.) The SOBC further states: "Our confidential and proprietary information gives us a competitive edge in the marketplace. It would harm the Company if it were disclosed inappropriately. In addition, as a public company we must be extremely careful that we control the disclosure of material information about our business. Company policy

18

**COMPLAINT**

requires all of us to keep CBRE's confidential information secure. This applies to information about our finances, strategies, operations, clients and compensation. It also applies equally to information belonging to our employees and clients." (*Id.*)

89.     Bowyer was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

90.     Bowyer understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

91.     Through Bowyer's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Bowyer had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

92.     Despite Bowyer's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, in the weeks leading up to Bowyer's resignation, he downloaded 64 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers including proprietary CBRE valuation technology; CBRE property information; client data, client property information; client property financials; market data; and subscription data.

93.     On information belief, Bowyer did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

94.     Despite the CBRE policy prohibiting such conduct, Bowyer connected an external USB storage device to his CBRE workstation on July 27, 2017, and removed it on August 13, 2019, his last day at CBRE.  During that time, 9 PDF files were created

or accessed on the drive.  Preliminary evidence from CBRE's investigation demonstrates that Bowyer accessed a "/Licensure" folder that was removed from his workstation minutes later and the USB was used to access a PDF file titled, "CBRE Valuation of Seniors Housing_2019."

95.    Bowyer additionally ran the application Snippingtool.exe on his CBRE workstation on August 12, 2019, the day before his departure, which allows a user to take screenshots of a screen without creating a record of having printed or exported specific files or data.  In total, Bowyer created and/or modified 117 PDF files on August 12 and August 13, 2019.

96.    A Cloud Report for Bowyer's activity on CBRE's systems shows 18,181 Box.com and OneDrive download events with 4,493 unique file names.  Of those unique files, 536 were located on Bowyer's CBRE-issued workstation.  None of the remaining 3,957 unique files recorded as downloaded from the Cloud Report were located on Bowyer's CBRE-issued workstation.

97.    On information and belief, these files were downloaded to a different *non-CBRE* workstation, such as Bowyer's personal computer so that he could continue to have access to and use CBRE's property (including its Trade Secrets) to unfairly compete with CBRE after he resigned.

98.    Further, Bowyer printed a number of CBRE confidential and proprietary documents to paper in the two days prior to his departure.

99.    Bowyer's CBRE email activity also shows suspicious behavior indicative of data exfiltration.  In particular, on July 24, 2019, between 11:22am and 11:23am, Bowyer sent 22 emails to and from his CBRE email account, with his personal Yahoo email address CC'd, with a subject line of "slides.ppt" (x8) and "slides" (x14).  Less than five minutes later, at 11:25am, a PowerPoint file named "CBRE Valuation of Seniors Housing_2019" was accessed from an external USB drive.

100.    Also a .pdf version of this PowerPoint was accessed from the same USB device at 11:21am, one minute prior to Bowyer sending the emails. Moreover, this

**COMPLAINT**

PowerPoint was also downloaded from the CBRE O365 and printed ("CBRE Valuation of Seniors Housing_2019[21508].pptx") from this workstation at 11:25am.

101.    Prior to his departure, Bowyer performed the following internet searches: "jll to hff;" "box download;" "settings_do_not_track;" "incognito;" "abletoextract v14;" and "able to extract."

102.    In JLL's announcement of its hire of Bowyer and others from CBRE, it stated that Bowyer would focus on leveraging technology and data at JLL.   Upon information and belief, Bowyer intends to improperly use, for example, the Property Insights and other CBRE Trade Secrets technology at JLL.

103.    In addition to downloading CBRE's Trade Secrets and other confidential and proprietary information, Bowyer and his co-conspirators solicited current CBRE employees and contractors to join him at CBRE's competitor—JLL—including while Bowyer was still employed by, and months before he resigned from, CBRE.

104.    For example, at several times in 2019 while Bowyer was still employed by CBRE, Bowyer solicited James Graber to leave CBRE with him.

105.    Upon information and belief, while Bowyer was still employed by CBRE and in violation of his obligations thereto, Bowyer solicited many other CBRE employees to leave CBRE with him.

### *Johnson*

106.    Johnson has been employed at CBRE since August 2014, until his resignation on August 9, 2019.

107.    Johnson entered into an EA-VAS with CBRE similar to Bowyer outlining his obligations to CBRE including (a) an acknowledgment that all information disclosed or developed by Johnson during his employment belonged to CBRE (Ex. J at ¶ 13(B)); (b) an obligation to maintain the confidentiality of all proprietary information of CBRE's during and after Johnson's employment with CBRE (*Id.* at ¶ 13(C)); and (c) and an obligation not to utilize CBRE's trade secrets to solicit any of CBRE's clients or employees for a period of one year following termination of the Agreement (*Id.* at ¶ 14).

**COMPLAINT**

Attached hereto as Exhibit J is a true and correct copy of Johnson's EA-VAS, dated June 24, 2014.

108.    Johnson's EA-VAS also makes it clear all work product made by Johnson is exclusively owned by CBRE.  (*Id.* at ¶ 13(B).)

109.    Johnson's EA-VAS and addendums thereto confirm that Johnson's employment with CBRE was at-will.  (*Id.* at ¶ 15.)

110.    In addition to the recited confidentiality and non-solicitation obligations contained in Johnson's EA-VAS, Johnson certified yearly, most recently in early 2019, that he acted in accordance with CBRE's SOBC.

111.    Johnson was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

112.    Johnson understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

113.    Through Johnson's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Johnson had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

114.    Despite Johnson's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, in the weeks leading up to his resignation, Johnson downloaded 889 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers including proprietary CBRE valuation technology; CBRE property information; client data, client property information; client property financials; market data; and subscription data.

115.    On information belief, Johnson did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

116.    Shockingly, Johnson also deleted 3,037 files from CRBE's Box.com account on August 12, 2019 without CBRE's authorization, several days after his resignation on August 9, 2019.  Upon information and belief, he did so in order to ensure that CBRE could not use such files, even though they were CBRE's property.

### *Lockard*

117.    Lockard has been employed by CBRE since October 2014.  At the time of his resignation Lockard held the title Vice President & Practice Leader CBRE Valuation & Advisory Services.   Attached as Exhibit K is a true and correct copy of Lockard's EA-VAS, dated October 13, 2014.

118.     Pursuant to the EA-VAS that Lockard entered into with CBRE, Lockard agreed that a confidential relationship exists between CBRE and its clients and Lockard agreed to protect the confidential relationship.  (Ex. K at ¶ 13.)

119.    In order to preserve the confidentiality of CBRE's information and to protect CBRE's proprietary interest in its trade secrets, Lockard agreed that "for a period of one year following the termination of this [Employment Agreement], (i) [Lockard] will not solicit, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's clients whom Appraiser solicited or with whom Appraiser dealt or became acquainted while Appraiser was employed with CBRE, and (ii) Appraiser will not solicit for employment, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's appraisers or employees." (*Id.* at ¶ 14.)

120.    Lockard's EA-VAS confirms that Lockard's employment with CBRE was at-will.

121.    In addition to the recited confidentiality and non-solicitation obligations contained in Lockard's EA-VAS, Lockard certified yearly, most recently in early 2019,

**COMPLAINT**

that he acted in accordance with CBRE's SOBC.

122.   Lockard further acknowledged his receipt of the CBRE Employee Handbook including the policies and procedures outlined in the handbook.

123.   Lockard was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

124.   Lockard understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

125.   Through Lockard's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Lockard had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

126.   Despite Lockard's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, in the weeks leading up to Bowyer's resignation, he downloaded 171 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers including proprietary CBRE valuation technology; CBRE property information; client data, client property information; client property financials; market data; and subscription data.

127.   On information belief, Lockard did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

128.   Lockard further downloaded a staggering 3,313 files from CBRE's Box.com account in a five-day span from June 7–11, 2019.

129.   Shockingly, Lockard downloaded 112 files from CBRE's Box.com account

**COMPLAINT**

on September 3, 2019, without CBRE's authorization, which was after he resigned from CBRE on August 9, 2019.

### *Fomenky*

130.    Fomenky began working for CBRE in October 2008, first as a Software Engineer, and then as a Senior Programmer and data scientist.  Fomenky resigned from CBRE on September 6, 2019.  Over the course of his employment at CBRE, Fomenky executed a number of written employment agreements, the most recent of which was effective January 8, 2018.  These agreements are attached to the forthcoming Declaration of Patti St. Clair, which is incorporated by reference herein.

131.    In Fomenky's Employment Agreements, Fomenky acknowledged that his employment was "at will."  He further agreed to protect CBRE's confidential and trade secret information.

132.    In 2018, Fomenky recognized "the protection of confidential information and trade secrets is essential for CBRE, its companies and employees future security.  To protect such information, employees may not disclose any trade secrets or confidential information (defined further in CBRE's policies)."

133.    Fomenky further agreed that all work product is exclusively owned by CBRE and irrevocably and unconditionally assigned to CBRE.

134.    In addition to the confidentiality and non-solicitation obligations contained in Fomenky's Employment Agreements, Fomenky certified yearly, most recently on April 16, 2019, that he acted in accordance with CBRE's SOBC.

135.    Fomenky was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

136.    Fomenky understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his EA-VAS agreements, as a recipient of the 2017

**COMPLAINT**

Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

137.    Through Fomenky's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Fomenky had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

138.    Despite Fomenky's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, he failed to do so.

139.    Fomenky ran MS Paint on his CBRE workstation on July 22, 2019, a Microsoft Windows utility that allows a user to capture data from a file and save it as well as capture information without creating a record of having printed or exported specific files or data.  One such file of interest associated with MS Paint is titled "2019-01-18 Property Insights.png."

140.    Fomenky also had heavy Cloud usage using CBRE's systems August 21, 2019, two days prior to Fomenky's resignation date.  The other Cloud usage in August took place on August 16, 2019, the day Fomenky announced he was leaving CBRE.

141.    Cloud services are a possible way for a user to exfiltrate data by uploading files from a company computer or email account and then downloading or accessing them outside of the company network.

142.    There were five files downloaded from Fomenky's CBRE OneDrive account to his workstation over a CBRE IP address, including "insights.zip," which is CBRE's proprietary Property Insights software.

143.    Based on CBRE's investigation to date, Fomenky's downloaded copy of Property Insights was not recovered on Fomenky's CBRE-issued computer.  Upon information and belief, Fomenky downloaded Property Insights to a non-CBRE issued device and still has the program in his possession today and plans to use it to bring a competing product to market at JLL to unfairly compete with CBRE's Property Insights.

**COMPLAINT**

144.   Using CBRE's systems, Fomenky accessed the unsanctioned Cloud service, Dropbox, at least twice using his "pfomenky@gmail.com" account.

145.   Additionally, Microsoft Utility Disk Cleanup 2000, an encryption/anti-forensic tool, was run on Fomenky's CBRE workstation on August 5, 2019.  This tool does not appear to have been run on Fomenky's CBRE workstation before that time.

146.   There was also evidence on Fomenky's CBRE workstation of highly suspicious deletions that increased threefold in the year he resigned.  He single and double deleted emails, with increased email deletion and double deletion around the time of his departure.  "Double deleted" are emails that are sent to the Deleted Items folder and emptied.

147.   In 2018, Fomenky double deleted 5,809 CBRE emails compared with 2019 where Fomenky double deleted 13,338 CBRE emails.  The amount of deletion from 2018 to 2019 is significant when considering prior deletion activity.  For example, in 2017, Fomenky double deleted only 3,939 CBRE emails and in 2016 this number was only 50.

148.   Fomenky also sent at least 42 unique emails from his CBRE email account to PFomenky@gmail.com, which included screen shots from CBRE's Property Insights.

149.   Fomenky also sent .zip emails to two unknown users attaching CBRE's confidential and proprietary information using CBRE's systems.

### *Austin*

150.   Prior to her employment, Austin received an offer letter from CBRE informing her of the importance of the protection of CBRE's confidential and trade secret information.  Austin agreed to the terms in CBRE's offer letter, which included that Austin agreed not to "disclose any trade secrets of confidential information (defined further in CBRE's policies)."

151.   Austin further understood and agreed that CBRE's Confidentiality Policy is ongoing even after employment with the Company Terminates." Additionally, Austin understood and agreed all work product made within the scope of employment with

27

**COMPLAINT**

CBRE is irrevocably and unconditionally assigned to CBRE.  Austin's offer letter is attached to the Declaration of Patti St. Clair, which is incorporated by reference herein.

152.    Austin certified yearly she acted in accordance with CBRE's SOBC, most recently in early 2019.

153.    Austin was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

154.    Austin understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her offer letter, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

155.    Through Austin's role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Austin had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

156.    Despite Austin's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Austin downloaded 378 highly confidential CBRE files (including Trade Secrets) confidential files from CBRE's password-protected servers in the weeks leading up to her resignation.

157.    On information belief, Austin did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

158.    Using CBRE's systems, Austin uploaded 22.11 MB of information to Dropbox, a non-sanctioned file-sharing website that CBRE maintains no control over.

159.    Austin's activity in CBRE Box.com downloads further spiked in June 2019, and her uploads in August (particularly on August 19, 2019) were three times as high as her monthly uploads from January through April of that same year.

**COMPLAINT**

160.    Shockingly, Austin made 84 downloads from CBRE's Box.com account in September 2019 without CBRE's authorization, including 26 downloads from that account on September 1, 2019 and 58 downloads from that account on September 3, 2019—this was all done without CBRE's authorization after Austin's resignation from CBRE on August 30, 2019.

### *Avery*

161.    Avery began working for CBRE in March 2017.   At the time of her resignation, Avery held the title Senior Valuation Associate.   In connection with her work at CBRE, Avery executed an Employment Agreement with CBRE. Attached as Exhibit L is a true and correct copy of Avery's EA-VAS, dated January 30, 2017.

162.    In Avery's EA-VAS, Avery agreed she "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE.  [Avery] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and Appraiser agrees to conduct Appraiser's activities and regulate Appraiser's habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. L at ¶ 7.)

163.    In Avery's EA-VAS, Avery agreed "any confidential information obtained by [Avery] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client."  (*Id.* at ¶ 13(D).)

164.    In order to preserve the confidentiality of CBRE's information and to protect CBRE's proprietary interest in its trade secrets, Avery agreed that "for a period of one year following the termination of this [Employment Agreement], (i) [Avery] will not solicit, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's clients whom Appraiser solicited or with whom Appraiser dealt or became acquainted while Appraiser was employed with CBRE, and (ii) Appraiser will not solicit for employment, on Appraiser's own behalf or on behalf

of any other person, firm, company or corporation, any of CBRE's appraisers or employees." (*Id.* at ¶ 14.)

165.    Avery's EA-VAS confirms that Avery's employment with CBRE was at-will.

166.    In addition to the recited confidentiality and non-solicitation obligations contained in Avery's EA-VAS, Avery certified that she acted in accordance with CBRE's SOBC.

167.    Avery was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

168.    Avery understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

169.    Through Avery's role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Avery had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

170.    Despite Avery's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Avery downloaded 505 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to her resignation.

171.    On information belief, Avery did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

172.    Using CBRE's systems, Avery uploaded 600.02 MB of information to

30

**COMPLAINT**

Dropbox, a non-sanctioned file-sharing website that CBRE maintains no control over.

173.    Further, Avery's CBRE Box.com downloads spiked in June, accounting for 63% of her 2019 downloads, including 13,155 downloads on June 9, 2019.

### *Cannarella*

174.    Cannarella began working for CBRE in June 2015.  At the time of her resignation, Cannarella held the title Senior Appraiser.  In connection with her work at CBRE, Cannarella executed an Employment Agreement with CBRE.  Attached as Exhibit M is a true and correct copy of Cannarella's EA-VAS, dated July 1, 2015.

175.    In Cannarella's EA-VAS, Cannarella agreed she "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE. [Cannarella] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and Appraiser agrees to conduct Appraiser's activities and regulate Appraiser's habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. M at ¶ 7.)

176.    In Cannarella's EA-VAS, Cannarella further agreed "any confidential information obtained by [Cannarella] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client.  (*Id.* at ¶ 13(D).)

177.    In order to preserve the confidentiality of CBRE's information and to protect CBRE's proprietary interest in its trade secrets, Cannarella agreed that "for a period of one year following the termination of this [Employment Agreement], (i) [Cannarella] will not solicit, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's clients whom Appraiser solicited or with whom Appraiser dealt or became acquainted while Appraiser was employed with CBRE, and (ii) Appraiser will not solicit for employment, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's appraisers or employees."  (*Id.* at ¶ 14.)

**COMPLAINT**

178.    Cannarella's EA-VAS and addendums thereto confirm that Cannarella's employment with CBRE was at-will.

179.    In addition to the recited confidentiality and non-solicitation obligations contained in Cannarella's EA-VAS, Cannarella certified that she acted in accordance with CBRE's SOBC.

180.    Cannarella was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

181.    Cannarella understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

182.    Through Cannarella's role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Cannarella had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

183.    Despite Cannarella's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Cannarella downloaded 420 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to her resignation.

184.    On information belief, Cannarella did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

### *Colton*

185.    Prior to employment, Colton received an offer letter from CBRE informing him of the importance of the protection of CBRE's confidential and trade secret

information.  Colton agreed to the terms in the offer letter, which included that Colton agreed not to "disclose any trade secrets of confidential information (defined further in CBRE's policies)."

186.    Colton further understood and agreed that CBRE's Confidentiality Policy is ongoing even after employment with the Company Terminates." Additionally, Colton understood and agreed all work product made within the scope of employment with CBRE is irrevocably and unconditionally assigned to CBRE.  Colton's offer letter is attached to the Declaration of Patti St. Clair, which is incorporated by reference herein.

187.    Colton certified yearly he acted in accordance with CBRE's SOBC, most recently in early 2019.

188.    Colton was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

189.    Colton understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his offer letter, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

190.    Through Colton's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Colton had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

191.    Despite Colton's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Colton downloaded 228 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to his resignation.

192.    On information belief, Colton did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with

33

**COMPLAINT**

CBRE.

### *Jones*

193.    Jones began working for CBRE in July 2012.  At the time of her resignation, Jones held the title Senior Appraiser.  In connection with her work at CBRE, Jones executed an Employment Agreement with CBRE.  Attached as Exhibit N is a true and correct copy of Jones' EA-VAS, dated March 20, 2014.

194.    In Jones' EA-VAS, Jones agreed she "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE.  [Jones] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and Appraiser agrees to conduct Appraiser's activities and regulate Appraiser's habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. N at ¶ 7.)

195.    In Jones' EA-VAS, Jones agreed "any confidential information obtained by [Jones] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client.  (*Id.* at ¶ 13(D).)

196.    Jones' EA-VAS confirms that Jones' employment with CBRE was at-will. (*Id.* at ¶ 14.)

197.    In addition to the recited confidentiality and non-solicitation obligations contained in Jones' EA-VAS, Jones certified that she acted in accordance with CBRE's SOBC.

198.    Jones was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

199.    Jones understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her EA-VAS agreements, as a recipient of the 2017 Memorandum,

acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

200.    Through Jones' role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Jones had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

201.    Despite Jones' duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Jones downloaded 993 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to her resignation.

202.    Shockingly, Jones made 2 downloads from CBRE's Box.com account without authorization on August 14, 2019 and 4 downloads on August 27, 2019—both of which were after Jones resigned from CBRE on August 13, 2019.

203.    On information belief, Jones did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

204.    Jones' CBRE Box.com download activity spiked in August 2019, accounting for 54% of her total downloads for the year, with 22,830 of those coming on August 2 and 3, 2019.  Her upload rate also spiked in August, accounting for 74% of the total uploads for the year.  Finally, she created 80% of her files from 2019 in August, with 3,009 of them created on August 2, 2019.

### *Lipton*

205.    Prior to employment, Lipton received an offer letter from CBRE informing her of the importance of the protection of CBRE's confidential and trade secret information.  Lipton agreed to the terms in the offer letter, which included that Lipton agreed not to "disclose any trade secrets of confidential information (defined further in CBRE's policies)."

206.    Lipton further understood and agreed that CBRE's Confidentiality Policy

**COMPLAINT**

is ongoing even after employment with the Company Terminates." Additionally, Lipton understood and agreed all work product made within the scope of employment with CBRE is irrevocably and unconditionally assigned to CBRE. Lipton's offer letter is attached to the Declaration of Patti St. Clair, which is incorporated by reference herein.

207. Lipton certified yearly she acted in accordance with CBRE's SOBC, most recently in early 2019.

208. Lipton was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

209. Lipton understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her offer letter, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

210. Through Lipton's role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Lipton had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

211. Despite Lipton's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Lipton downloaded 73 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to her resignation.

212. On information belief, Lipton did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

213. Lipton's CBRE Box.com downloads spiked in June, including 1,866 downloads on a single day, June 9, 2019. Her June downloads account for 99% of all her downloads from April through August, 2019.

**COMPLAINT**

*Palac*

214.    Prior to employment, Palac received an offer letter from CBRE informing him of the importance of the protection of CBRE's confidential and trade secret information.  Palac agreed to the terms in the offer letter, which included that Palac agreed not to "disclose any trade secrets of confidential information (defined further in CBRE's policies)."

215.    Palac further understood and agreed that CBRE's Confidentiality Policy is ongoing even after employment with the Company Terminates."  Additionally, Palac understood and agreed all work product made within the scope of employment with CBRE is irrevocably and unconditionally assigned to CBRE.  Palac's offer letter is attached to the Declaration of Patti St. Clair, which is incorporated by reference herein.

216.    Palac certified yearly he acted in accordance with CBRE's SOBC, most recently in early 2019.

217.    Palac was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

218.    Palac understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his offer letter, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

219.    Through Palac's role at CBRE, he unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Palac had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

220.    Despite Palac's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, using CBRE's systems, Palac uploaded 400.87 MB of information to Dropbox, a non-sanctioned file-sharing website that CBRE maintains

37

**COMPLAINT**

no control over.

221.    Palac downloaded over 10,000 files from CBRE's Box.com account in June of 2019.  His uploads also spiked in June 2019.

### *Sarkis*

222.    Sarkis began working for CBRE in June 2017.  At the time of his resignation, Sarkis held the title Senior Valuation Associate.  In connection with his work at CBRE, Sarkis executed an Employment Agreement with CBRE.  Attached as Exhibit O is a true and correct copy of Sarkis' EA-VAS, dated May 17, 2017.

223.    In Sarkis' EA-VAS, Sarkis agreed he "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE.  [Sarkis] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and Appraiser agrees to conduct Appraiser's activities and regulate Appraiser's habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. O at ¶ 7.)

224.    In Sarkis' EA-VAS, Sarkis agreed "any confidential information obtained by [Sarkis] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client.  (*Id.* at ¶ 13(D).)

225.    In order to preserve the confidentiality of CBRE's information and to protect CBRE's proprietary interest in its trade secrets, Sarkis agreed that "for a period of one year following the termination of this [Employment Agreement], (i) [Sarkis] will not solicit, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's clients whom Appraiser solicited or with whom Appraiser dealt or became acquainted while Appraiser was employed with CBRE, and (ii) Appraiser will not solicit for employment, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's appraisers or employees."  (*Id.* at ¶ 14.)

226.   Sarkis' EA-VAS and addendums thereto confirm that Sarkis' employment with CBRE was at-will.

227.   In addition to the recited confidentiality and non-solicitation obligations contained in Sarkis' EA-VAS, Sarkis certified that he acted in accordance with CBRE's SOBC.

228.   Sarkis was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

229.   Sarkis understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, his EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

230.   Through Sarkis' role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Sarkis had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

231.   Despite Sarkis' duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Sarkis downloaded 185 highly confidential CBRE files (including Trade Secrets) from CBRE's password-protected servers in the weeks leading up to his resignation.

232.   On information belief, Sarkis did so in an effort to assist, with the knowledge of, and in conspiracy with, Defendants to help them unfairly compete with CBRE.

233.   Using CBRE's systems, Sarkis uploaded 9.1 MB of information to Dropbox, a non-sanctioned file-sharing website that CBRE maintains no control over.

234.   Sarkis' downloads from CBRE's Box.com account spiked in March

39

**COMPLAINT**

(10,299) and June (5,756), with 3,946 downloads on June 9, 2019, right around the time when many of the other Defendants had large activity spikes in Box.com downloads. Sarkis further uploaded 1,453 files in a two day span from August 2–3, 2019.

### Sunday

235.   Sunday began working for CBRE in May 2016.   At the time of her resignation, Sunday held the title Senior Associate.   In connection with her work at CBRE, Sunday executed an Employment Agreement with CBRE. Attached as Exhibit P is a true and correct copy of Sunday's EA-VAS, dated May 2, 2016.

236.   In Sunday's EA-VAS, Sunday agreed she "shall perform all valuation or evaluation services solely on behalf of and under the direction of CBRE.  [Sunday] shall devote Appraiser's full business time and best efforts toward furthering the interests of CBRE, and Appraiser agrees to conduct Appraiser's activities and regulate Appraiser's habits so as to maintain and to increase rather than diminish the good will and reputation of CBRE."  (Ex. P at ¶ 7.)

237.   In Sunday's EA-VAS, Sunday agreed "any confidential information obtained by [Sunday] in connection with an appraisal, and the appraisal report as a whole, shall not be disclosed to anyone, including other employees of CBRE, without specific authorization of the client.  (*Id.* at ¶ 13(D).)

238.   In order to preserve the confidentiality of CBRE's information and to protect CBRE's proprietary interest in its trade secrets, Sunday agreed that "for a period of one year following the termination of this [Employment Agreement], (i) [Sunday] will not solicit, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's clients whom Appraiser solicited or with whom Appraiser dealt or became acquainted while Appraiser was employed with CBRE, and (ii) Appraiser will not solicit for employment, on Appraiser's own behalf or on behalf of any other person, firm, company or corporation, any of CBRE's appraisers or employees."  (*Id.* at ¶ 14.)

239.   Sunday's EA-VAS, and addendum thereto, confirms that Sunday's employment with CBRE was at-will.

240.   In addition to the recited confidentiality and non-solicitation obligations contained in Sunday's EA-VAS, Sunday certified that she acted in accordance with CBRE's SOBC.

241.   Sunday was further subject to CBRE's Information Asset Protection Policy, the Confidentiality/Non-Disclosure Policy, the Use of Company Property Policy, Electronic Communications & Acceptable Use of Technology, and the Acceptable Use of Computers Policy.

242.   Sunday understood the importance of CBRE's Trade Secrets as evidenced by, *inter alia*, her EA-VAS agreements, as a recipient of the 2017 Memorandum, acknowledgment CBRE's SOBC, and use of a password to access CBRE's protected information.

243.   Through Sunday's role at CBRE, she unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information, including CBRE's proprietary software Property Insights. Further, Sunday had access to CBRE's company documents and information with the specific understanding that they be kept confidential.

244.   Despite Sunday's duty to maintain the confidentiality of CBRE Trade Secrets and other proprietary information, Sunday used CBRE's systems to use a cloud hosting program called Aternity.  She had 14 sessions logged from August 5, 2019 through September 4, 2019, which included downloading 73,830 MB of information and uploading 14,336 MB of information.

245.   Further, Sunday had a series of suspicious CBRE email activity starting in June 2019 and lasting through her resignation.  It is apparent that Sunday knew of Bowyer's plan to leave with a group of CBRE employees significantly earlier than her date of resignation.   For example, Sunday emailed Bowyer in July of 2019 asking him to "true me up sooner rather than later with changes afoot!"

41

**COMPLAINT**

246.    On August 6, 2019, Sunday received an email in her CBRE account from Perona at JLL regarding a potential opportunity at JLL, and she responded that she was interested in the position on August 12, 2019.  That same day, Sunday downloaded a large number of files from CBRE's systems and some emails, which was out of the ordinary for her workstation activity.

247.    She also deleted a significant number of CBRE's files on August 12, 2019, mostly from OneDrive, as well as on August 21, 2019, and suspiciously renamed a number of files.

### Defendants' Other Misconduct

248.    On August 15, 2019, JLL announced that it had hired Bowyer, Johnson, and Lockard "to strengthen its Valuation Advisory business and create an industry leading Seniors Housing & Healthcare platform."  The announcement stated that Bowyer will help lead JLL's "Valuation Advisory through the introduction of advanced data products in the valuation space."  It further quotes Bowyer as stating, "JLL's reputation as a technology-forward business is a great platform where our expertise and passion for data can be utilized to its fullest potential to meet our clients' evolving needs. We are excited to continue to work with JLL's expanding client base to deliver valuation solutions to not only meet their current needs but also provide new insights into their investment portfolios and improve their abilities to execute in the marketplace."  This announcement can be found at https://www.us.jll.com/en/newsroom/jll-adds-veteran-talent-to-valuation-advisory-seniors-housing-business.  A similar, but shortened version of the announcement was published on August 16, 2019, on Seniors Housing Business, which can be found at https://seniorshousingbusiness.com/jll-hires-three-industry-veterans-to-valuation-advisory-seniors-housing-business/.

249.    On August 16, 2019, after Bowyer had resigned from CBRE, Bowyer had several email exchanges with Jon Cruse at JLL regarding recreating a CBRE quick market study for JLL, thereby appropriating for himself the hard work, creativity, diligence, and investment of CBRE in developing the framework and other key features

42

**COMPLAINT**

and pricing of that study. Bowyer also disclosed CBRE's pricing for this proprietary product to JLL in that email exchange.

250. On August 27, 2019, after Lockard had resigned from CBRE, he emailed CBRE's Client, Client A,[1] providing them with his new contact information at JLL. Lockard also wrote in that email that "As you know, myself, Zach Bowyer, Bennett Johnson and most of the seniors team have transitioned to JLL. Also, will you be attending NIC this year? If so, it would be great to connect, and I can update you on the details of our transition." Lockard also writes "Or please call my cell at your convenience and we can catch up."

251. On August 27, 2019, Client A responded to Lockard's email, writing that "Zach reached out with his new contact info as well, so I'm glad we are all back in touch. And yes, I'll be at NIC. My schedule is currently more open on Thursday; would you and the team have a few minutes to meet then?"

252. On August 27, 2019, Lockard responded to Client A's email, writing "Yes, we are wide open on Thursday. Please let us know a time that is convenient for you and the team. Looking forward to connecting."

253. On August 28, 2019, Arnold Vieyra ("Vieyra") and Cannarella while both still employed at CBRE engaged in an instant message conversation using CBRE's systems. In that conversation, Vieyra referred to holding off sending their senior housing market overview to an individual, stating 'The spoils of war!' and "Grab what you can during the chaos!" Cannarella responded, "hahaha." She later asked Vieyra if he "had to do any clean-up/review comments from anything of [B]ennett [Johnson]'s have you?" Vieyra responded, "no." Vieyra then stated that "James wants to chat with

---

[1] The alias Client A is being used to protect the confidentiality of CBRE's clients. The identity of Client A will be provided to Defendants after the parties enter into a mutually-acceptable Stipulated Protective Order and the information regarding this client is designated pursuant thereto.

**COMPLAINT**

me this Friday . . . oh boy . . ." Cannarella responded, "you could just quite [sic] before that lol." Vieyra responded, "ha ha. tempting . . ."

254.    On August 29, 2019, Client A emailed Lockard, writing "Regarding the NIC, I saw that you had a meeting scheduled with Sara and Kyle at 4:30 CT that Thursday, so I'll just plan on joining that meeting. If Zach and the team are not available at that time, then I'm happy to set up another time to meet as well, just let me know."

255.    On August 29, 2019, Lockard forwarded the above-described email chain with Client A to Bowyer, Brian Chandler, and Johnson (at his CBRE email address).

256.    From September 11–September 13, 2019, Bowyer, Lockard, and Johnson attended NIC. NIC is a bi-annual conference referred to as the "marquee event" of the seniors housing and care industry. Attendees of the conference connect to network and gain insight into the seniors housing industry.

257.    While at NIC, Bowyer, Lockard, and Johnson met with current CBRE clients with the intention to solicit them away from CBRE. During the meetings, Bowyer, Lockard, and Johnson went as far as to misrepresent to current CBRE clients that CBRE no longer had a Seniors Housing valuation team.

258.    On September 12, 2019, while at NIC, Bowyer attempted to intimidate James Graber and Daniel Lincoln, employees of CBRE, from contacting CBRE's own clients.

259.    Also at NIC this year, Bowyer walked up behind James Graber and Micah Beck (CBRE VAS employees) at an intimate client event, put his arms on their shoulders, and announced, "You motherf*ckers hacked my sh*t, no way you would have been invited to this event," and then stormed off. Such an allegations is, of course, not true.

260.    As set forth herein, Defendants' conduct has continued, even after being reminded of their obligations to CBRE even after their resignations.

261.    Thus, in light of the gravity of their conduct and that it has continued despite warnings, CBRE seeks immediate relief to stop Defendants from continuing to engage

44

**COMPLAINT**

in their nefarious plot to use CBRE's confidential, proprietary, and trade secret information and interfere with CBRE's business, in violation of their contractual and legal obligations to CBRE.

## FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets – 18 U.S.C. § 1836 – All Defendants)

262.    CBRE incorporates by reference and realleges each and every allegation of Paragraphs 1 through 261 as if set forth herein.

263.    This action arises under the Defend Trade Secrets Act of 2016, codified at 18 U.S.C. § 1836.

264.    CBRE owns valuable confidential information and trade secrets, including, but not limited to CBRE's Trade Secrets. CBRE has taken reasonable measures to keep such information secret. CBRE derives independent economic value, actual or potential, from its Trade Secrets not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from disclosure or use of the same.

265.    CBRE has expended substantial time, effort, and money in developing the CBRE's Trade Secrets over the course of many years of doing business. CBRE's Trade Secrets are vital to maintaining its business and competitive advantage in the marketplace.

266.    CBRE has also taken reasonable steps, such as through the execution of confidentiality agreements, password protection, access cards, and other means to maintain the secrecy of CBRE's Trade Secrets.

267.    Defendants gained access to CBRE's Trade Secrets over the course of their work with CBRE, under an obligation to maintain the secrecy of the information.

268.    Defendants improperly and without authorization downloaded CBRE's Trade Secrets as part of a conspiracy and scheme to go work for JLL in direct competition with CBRE, and in breach of their duty of confidentiality and other obligations to CBRE. Additionally, upon information and belief, Defendants improperly

45

**COMPLAINT**

and without authorization shared CBRE's Trade Secrets with JLL under circumstances whereby JLL had reason to know that Defendants used improper means to acquire them.

269.    Upon information and belief, Defendants are using CBRE's Trade Secrets, such as the Property Insights program, in direct competition with CBRE.

270.    Defendants' misappropriation of CBRE's Trade Secrets was willful and malicious given, *inter alia*, the development of a scheme to unfairly compete with and steal CBRE's Trade Secrets while still working at CBRE, the downloading of tens of thousands of files, including thousands of highly confidential Trade Secrets in the weeks leading up to the resignation of Defendants, and the repeated misrepresentations to CBRE that Defendants would comply with CBRE's polices and agreements.

271.    By way of the parties' conspiracy, each of the Defendants is liable for the misappropriation and other wrongful acts of the other.

272.    Because Defendants' work at JLL is in direct competition with CBRE's VAS division, CBRE has and will continue to suffer imminent and irreparable harm as a result of Defendants' misappropriation.  CBRE is presently aware of at least 22 customers lost due to Defendants' conspiracy.

273.    On information and belief, Defendants' misappropriation of CBRE's Trade Secrets is ongoing and will continue unless and until temporarily and preliminarily restrained.  The harm that CBRE will suffer if Defendants are not restrained includes the loss of its current and potential clients and decreased profits.

274.    CBRE has no adequate remedy at law to rectify Defendants' misappropriation.

**COMPLAINT**

## SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets – California Civil Code §§ 3426.1, *et seq.* – All Defendants)

275. CBRE incorporates by reference and realleges each and every allegation of Paragraphs 1 through 274 as if set forth herein.

276. CBRE owns valuable confidential information and trade secrets, including, but not limited to CBRE's Trade Secrets.  CBRE has taken reasonable measures to keep such information secret.  CBRE derives independent economic value, actual or potential, from its Trade Secrets not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from disclosure or use of the same.

277. CBRE has expended substantial time, effort, and money in developing the CBRE Trade Secrets over the course of many years of doing business.  CBRE's Trade Secrets are vital to maintaining its ability to act as valuation and advisory services provider.

278. CBRE has also taken reasonable steps, such as restricting access to confidential information and through the execution of confidentiality agreements.

279. Accordingly, the information described above constitutes "trade secrets" under California's Uniform Trade Secrets Act, Civil Code §§ 3246, *et seq.*

280. Defendants gained access to CBRE's Trade Secrets over the course of their work with CBRE, with an obligation to maintain the secrecy of the information.  Defendants then, upon information and belief, shared these Trade Secrets with CBRE's competitor, JLL.  Defendants' acts were specifically targeted at CBRE, a California corporation.

281. Given their former work with CBRE, and by virtue of having signed confidentiality agreements, Defendants remain under a duty to keep CBRE's confidential and proprietary information secret, and not to use or disclose such information other than for the benefit of CBRE and with CBRE's permission.

**COMPLAINT**

282.   On information and belief, leading up to and following Bowyer's resignation from CBRE, Bowyer instructed his team to use and disclose CBRE's Trade Secrets through improper means and by breaching contractual, as well as fiduciary duties to CBRE to maintain the secrecy of such confidential and trade secret information.  In particular, as described above, Defendants used CBRE's Trade Secrets to improperly compete with CBRE at CBRE's competitor, JLL.  Each of the Defendants conspired with the other Defendants to engage in the wrongful conduct alleged below, the harm of which was felt by CBRE in California.

283.   As a result of Defendants' misappropriation, disclosure and misuse of CBRE's Trade Secrets, CBRE has and will continue to suffer imminent and irreparable harm in California.

284.   On information and belief, Defendants' misappropriation of CBRE's Trade Secrets is ongoing and will continue unless and until temporarily and preliminarily restrained. The harm that CBRE will suffer if Defendants are not restrained includes the loss of its current and potential clients and decreased profits in the amount to be ascertained at trial.

285.   By way of the parties' conspiracy, each of the Defendants is liable for the misappropriation and other wrongful acts of the other.

286.   CBRE has no adequate remedy at law to rectify Defendants' misappropriation because it would be impossible to fully quantify its losses in monetary terms and because Defendants will continue to engage in their wrongful conduct and irreparably harm CBRE unless enjoined from doing so.

287.   The acts of misappropriation committed by Defendants were done willfully, maliciously, oppressively, and fraudulently with the deliberate intent to injure CBRE's business and financially benefit Defendants in their business, thereby entitling CBRE to an award of exemplary and punitive damages in a sum according to proof pursuant to Civil Code § 3426.3.

288.   CBRE is further entitled to reasonable attorneys' fees pursuant to Civil Code § 3426.4.

## THIRD CAUSE OF ACTION

### (Breach of Contract – All Defendants)

289.   CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 288 as if set forth herein.

290.   Defendants entered into valid and enforceable written agreements with CBRE as set forth herein.

291.   For example, through Bowyer's EA-VAS (Ex. H) and Addendum thereto, Bowyer agreed to devote his full business time and best efforts toward furthering the interest of CBRE.

292.   Through their respective written Employment Agreements and Addendums thereto (Exs. H, J-P and as attached to the forthcoming Declaration of Patti St. Clair, which is incorporated herein by reference) and the polices described herein, all Defendants agreed to protect and not improperly use CBRE's Trade Secrets, as well as confidential and proprietary information.  They also had a duty to return, and to refrain from using, CBRE's property upon their resignations.  They also had a duty to cease using CBRE's systems upon their resignations.  They also had a duty to not use restricted devices, like non-sanctioned Cloud services and USB devices.  They also had a duty to not disclose CBRE's confidential, proprietary, and trade secret information.

293.   Defendants further agreed that all materials prepared or developed by them, for or at the direction of CBRE, are the property of CBRE.

294.   Defendants breached their obligations to CBRE under valid and enforceable agreements as set forth herein, including by violating their obligations to CBRE as set forth in the paragraphs above.

295.   For example, by misappropriating CBRE's Trade Secrets and otherwise secreting, using, disclosing, and transmitting CBRE's confidential, proprietary, and trade secret information, all Defendants breached their respective employment

49

**COMPLAINT**

agreements with CBRE and polices described herein, including their obligations to maintain CBRE's confidential information.

296.    By misappropriating CBRE's Trade Secrets, including the theft of CBRE's Property Insights program, Fomenky breached his Employment Agreement, including a breach of the confidentiality provision therein.

297.    By misappropriating CBRE's Trade Secrets, Austin, Colton, Lipton, and Palac each breached their respective employment agreements, including a breach of the confidentiality provision therein.

298.    By violating CBRE's policies regarding banned devices, Defendants breached their obligations to CBRE.

299.    By violating CBRE's policies regarding returning CBRE property upon resignation, Defendants breached their obligations to CBRE.

300.    By planning and developing a competing VAS group at JLL while still employed at CBRE, Defendants breached their obligations to CBRE.

301.    CBRE at all times performed all of its obligations under the agreements with Defendants and related policies.

302.    As a proximate and direct result of Defendants' conduct, CBRE has suffered damages at least in the form of loss of clients, employees, and salespeople in an amount yet ascertained to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Intentional Interference with Business Relations – Bowyer, Lockard, and Johnson)

303.    CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 302 as if set forth herein.

304.    CBRE has established business relationships with clients in the valuation and advisory services market.

305.    Bowyer, Lockard, and Johnson are fully aware of the business relationships that existed between CBRE and its clients.   Despite this knowledge, they have

50

**COMPLAINT**

intentionally and knowingly interfered with these business relationships, including through the use of CBRE's Trade Secrets to improperly solicit CBRE's clients.  For example, as described above, Bowyer contacted CBRE clients to solicit them to cancel their relationships with CBRE so that they could work with Bowyer at JLL and through Bowyer's attempts to intimidate CBRE employees from contacting CBRE's own clients, so that he could continue his wrongful solicitation of these clients unimpeded.

306.    Bowyer, Lockard, and Johnson have contacted CBRE's current and potential clients in an attempt to displace CBRE in the market by using wrongful conduct, including the misappropriation and use of CBRE's Trade Secrets as part of their solicitation.  Bowyer and Johnson further have falsely told current CBRE clients that CBRE no longer has a Seniors Housing VAS practice in an effort to undermine CBRE in the market.

307.    CBRE has lost at least 22 clients following Defendants' departure and as a result of Defendants' conduct.

308.    The acts of Bowyer, Lockard, and Johnson have adversely impacted CBRE's business relationships including the ability of CBRE's clients to trust CBRE is able to perform valuation services.

309.    By way of the parties' conspiracy, each of these defendants is liable for the intentional interference and other wrongful acts of all of the Defendants.

310.    As a proximate result of Bowyer, Lockard, and Johnson's conduct, CBRE has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

**(Violation of California Unfair Competition Law – Cal. Civ. Code §§ 17200, *et seq.* – All Defendants)**

311.    CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 310 as if set forth herein.

312.    Defendant's misuse and unlawful misappropriation of CBRE's Trade Secrets, along with its wrongful acts inducing CBRE's former employees to breach their

51

**COMPLAINT**

contractual obligations and duties to CBRE and to wrongfully solicit CBRE's clients and employees using CBRE's Trade Secrets, to unfairly compete against CBRE as described herein constitutes unlawful and/or unfair business practices or acts in violation of Section 17200 et seq. of the California Business and Professions Code and California common law.

313.   As a direct and proximate result of Defendants' unlawful and unfair business practices, CBRE has suffered and will continue to suffer substantial pecuniary losses and irreparable injury to its business reputation and goodwill.  As such, CBRE's remedy at law is not adequate to compensate for injuries inflicted by Defendants. Accordingly, CBRE is entitled to temporary, preliminary, and permanent injunctive relief, as well as restitution.

314.   By way of the parties' conspiracy, each of the Defendants is liable for the wrongful acts of the other.

## SIXTH CAUSE OF ACTION

### (Intentional Interference with Contract – Bowyer, Johnson, and Lockard)

315.   CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 314 as if set forth herein.

316.   CBRE had entered into valid contracts with certain clients.

317.   CBRE had entered into valid contracts with certain at-will employees, including Austin, Avery, Colton, Fomenky, Jones, Lipton, Palac, Sarkis and Sunday, including regarding the protection of its confidential and proprietary information (including CBRE's Trade Secrets).  These contracts include EA-VAS, offer letters, and the employment agreements discussed above.

318.   Bowyer knew of the contracts between CBRE and Avery, Sarkis and Sunday at least because he was a signatory on the agreements.

319.   Upon information and belief, Bowyer, Johnson, and Lockard knew of the contracts between CBRE and Austin, Colton, Fomenky, Jones, Lipton, and Palac because, *inter alia*, of their roles at CBRE.

52

**COMPLAINT**

320.    Upon information and belief, Bowyer, Johnson, and Lockard knew of the contracts between CBRE and its clients, because, *inter alia*, of their roles at CBRE.

321.    Upon information and belief, Bowyer's, Johnson's, and Lockard's conduct was intended to disrupt performance of these contracts, or Bowyer, Johnson, and Lockard knew that their conduct was certain or substantially certain to cause such disruption.  Such intention and/or knowledge is evidenced by Bowyer's, Johnson's, and Lockard's wrongful acts described herein, including their efforts to procure CBRE's confidential and proprietary information (including CBRE's Trade Secrets) in violation of their contractual obligations to CBRE, and their use of such information to solicit CBRE's clients and employees in violation of Bowyer, Johnson and Lockard's and other Defendants' obligations to CBRE.

322.    Bowyer's, Johnson's, and Lockard's knowing and intentional acts fall outside the boundaries of fair competition in that they, *inter alia*, involved unlawfully misappropriating CBRE's Trade Secrets and using same to hire CBRE's at-will employees and steal CBRE's current clients and prospective clients, inducing CBRE's employees to violate their contractual and legal obligations to CBRE, and unfair competition.

323.    Bowyer's, Johnson's, and Lockard's conduct prevented performance or made performance more expensive or difficult and in some cases caused the termination of CBRE's contracts with its clients and caused the remaining Defendants to breach their contractual obligations to CBRE.

324.    As a consequence of Bowyer's, Johnson's, and Lockard's intentional conduct, CBRE has been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations – Bowyer, Johnson, and Lockard)

325.    CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 324 as if set forth herein.

53

**COMPLAINT**

326. CBRE had an economic relationship with its at-will employees including, but not limited to, Austin, Avery, Colton, Fomenky, Jones, Lipton, Palac, Sarkis, and Sunday, as well as CBRE's current clients and prospective clients.

327. These economic relationships presented a high probability of future economic benefit to CBRE and CBRE has invested substantial resources in developing and maintaining these relationships, which include through training, developing its VAS group, and its VAS business.

328. Upon information and belief, Bowyer, Johnson, and Lockard knew of these relationships and their value by way of, *inter alia*, their work at CBRE.

329. Upon information and belief, Bowyer, Johnson, and Lockard have misused CBRE's confidential and proprietary information (including CBRE's Trade Secrets), and without CBRE's consent, to solicit CBRE's at-will employees, clients, and prospective clients.

330. Bowyer, Johnson, and Lockard have willfully and deliberately committed the wrongful acts alleged herein with the intent to interfere with the at-will employment relations between CBRE and its at-will employees, as well as CBRE's relations with its clients and prospective clients, which Bowyer, Johnson, and Lockard knew to exist.

331. Bowyer's, Johnson's, and Lockard's wrongful acts, as set forth above, caused injurious interference with, and disruption of, the at-will employment relations between CBRE and its at-will employees to occur (including through the resignation of its employees to join JLL, CBRE's competitor, and their violation of obligations to CBRE), as well as CBRE's relations with its current clients and prospective clients, which include CBRE's clients' termination (or significant decrease) of their relationship with CBRE.

332. Bowyer's, Johnson's, and Lockard's knowing and intentional acts fall outside the boundaries of fair competition in that they, *inter alia*, involved unlawfully misappropriating CBRE's Trade Secrets and using same to hire CBRE's at-will employees and steal CBRE's current clients and prospective clients, inducing CBRE's

54

**COMPLAINT**

employees to violate their contractual and legal obligations to CBRE, and unfair competition.

333.   As a proximate result of Bowyer's, Johnson's, and Lockard's conduct, CBRE has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

334.   Bowyer's, Johnson's, and Lockard's acts in interfering with CBRE's at-will employment relations with its employees, as well as economic relations with CBRE's current clients and prospective clients were willful and malicious, and designed to obstruct and otherwise interfere with the successful operation of CBRE's business. CBRE therefore is entitled to recover exemplary and punitive damages in a sum sufficient to punish Defendant.

## EIGHTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations – Bowyer, Johnson, and Lockard)

335.   CBRE incorporates by reference and realleges the allegations in paragraphs 1 through 334 as if fully set forth herein.

336.   CBRE had an economic relationship with its at-will employees including, but not limited to, Austin, Avery, Colton, Fomenky, Jones, Lipton, Palac, Sarkis, and Sunday, as well as CBRE's current clients and prospective clients.

337.   These economic relationships presented a high probability of future economic benefit to CBRE and CBRE has invested substantial resources in developing and maintaining these relationships.

338.   Upon information and belief, Bowyer, Johnson, and Lockard knew of these relationships and their value by way of, *inter alia*, Bowyer's, Johnson's, and Lockard's work at CBRE.

**COMPLAINT**

339.    Upon information and belief, Bowyer, Johnson, and Lockard failed to act with reasonable care by, *inter alia*, unlawfully misappropriating CBRE's confidential and proprietary information (including CBRE's Trade Secrets), and without CBRE's consent, to solicit CBRE's at-will employees including, but not limited to, Austin, Avery, Colton, Fomenky, Jones, Lipton, Palac, Sarkis, and Sunday, as well as to solicit CBRE's current clients and prospective clients.

340.    Bowyer's, Johnson's, and Lockard's failure to act with reasonable care by committing wrongful acts, as set forth above and including through the misappropriation of CBRE's Trade Secrets, caused injurious interference with, and disruption of, the at-will employment relations between CBRE and its at-will employees, along with CBRE's relations with its clients.

341.    As a proximate result of Bowyer's, Johnson's, and Lockard's wrongful and negligent conduct, CBRE has suffered injury and damage to its business and goodwill in an amount to conform to proof at trial.

## NINTH CAUSE OF ACTION

### (Computer Fraud and Abuse Act – 18 U.S.C. § 1030 – All Defendants)

342.    CBRE incorporates by reference and re-alleges each and every allegation of paragraphs 1 through 341 as if set forth herein.

343.    CBRE's computers and computer systems are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2) of the Computer Fraud and Abuse Act.

344.    Following their resignation from CBRE, Johnson, Lockard, Austin, and Jones intentionally accessed CBRE's protected computer systems via their CBRE Box.com accounts after their respective resignations, without authorization and/or in excess of any authorized access, and thereby obtained information from CBRE's protected computer system.

345.    Upon information and belief, Johnson, Lockard, Austin, and Jones did so in furtherance of Defendants' conspiracy and scheme to steal from and unfairly compete with CBRE.

**COMPLAINT**

346.    As a direct consequence of Defendants' conduct, CBRE has suffered damages in an amount exceeding $5,000 including the costs necessary to remedy their unauthorized access and resulting damage.

347.    By way of the parties' conspiracy, each of the Defendants are liable for the violation of this statute and other wrongful acts of the other.

348.    As a proximate and direct result of Defendants' conduct, CBRE has suffered damages at least in an amount yet ascertained to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, CBRE prays for judgment against Defendants as follows:

A.    Compensatory damages in an amount to be proven at trial;

B.    Exemplary and punitive damages;

C.    A temporary restraining order, preliminary injunction, and permanent injunction restraining Defendants and their agents, employees, salespeople, and all others acting in concert with them from the use, transmission, disclosure, and/or dissemination of CBRE's Trade Secrets for any reason, along with the following;

  a. Temporary and permanent orders requiring the Defendants return to CBRE all documents, data, and other property of CBRE, as determined by CBRE, including any external drives used to upload or transfer electronic information from CBRE's network or any other devices used to obtain CBRE's trade secrets and other confidential and proprietary information;

  b. Temporary and permanent orders requiring Defendants to undergo a forensic investigation by a third-party neutral, at Defendants' expense, of Defendants' as well as their spouses', significant others', domestic partners', and family members' computers, communication, electronic and information systems (including, *inter alia,* tablets, USB drives, PDAs, phones, hard drives, email accounts, Cloud accounts, messaging applications) to capture and identify all media in the possession, custody or control of Defendants and to isolate and remove from Defendants' system

57

**COMPLAINT**

all documents, data, and other property of CBRE, including CBRE's Trade Secrets and other confidential and proprietary information;

c.   Temporary and permanent orders requiring and enjoining the Defendants from using, either directly or indirectly, any CBRE property (including Trade Secrets) without express written authorization from CBRE;

d.   Temporary and permanent orders requiring and enjoining Defendants from working on any matter involving entities or individuals who were clients of CBRE wherein such clients were solicited using CBRE's Trade Secrets during the pendency of litigation or until such time that the Court can fashion an appropriate remedy;

e.   Temporary and permanent orders requiring the Defendants to protect and preserve evidence stored on any device and electronic account related to the allegations in this matter, including all evidence of the recruitment, compensation, and employment/engagement of Defendants;

f.   Temporary and permanent orders requiring that Defendants refrain from contacting any current or former employee at CBRE for the purpose of obtaining any of CBRE's confidential and/or Trade Secret information, and from contacting any person for the purpose of obtaining CBRE's confidential and/or Trade Secret information, or from otherwise obtaining CBRE's confidential and/or Trade Secret information in any way;

g.   Temporary and permanent orders requiring that Defendants refrain from using any CBRE confidential and/or Trade Secret information to solicit or induce any clients of CBRE to terminate their relationship with CBRE;

h.   Temporary and permanent orders requiring that Defendants refrain from using any CBRE confidential and/or Trade Secret information to solicit or induce any CBRE employee to terminate his or her employment with CBRE;

**COMPLAINT**

i.   Expedited discovery to determine the full extent of Defendants' unlawful actions, including but not limited to early expedited depositions of Defendants (in addition to regularly-noticed depositions) so that they can be questioned under oath regarding their acquisition, use, deletion, transmittal, and disclosure of CBRE's Trade Secrets and other confidential and proprietary information, as well as written discovery in furtherance of such efforts; and

j.   For such other orders as the Court shall deem appropriate.

D.   An order requiring Defendants to collect and return any and all copies of CBRE's Trade Secrets that Defendants misappropriated from CBRE as identified and determined by CBRE;

E.   An ordering requiring Defendants to immediately preserve all documentary and physical evidence in their care, custody or control, including all electronic devices that may contain any evidence of CBRE Trade Secrets;

F.   All pre-judgment and post-judgment interest as allowed by law;

G.   Attorneys' fees and costs; and

**COMPLAINT**

H.    Such other relief as the court may deem just and proper.

Dated:  October 23, 2019                    Respectfully submitted,

                                            K&L Gates LLP

                                            By: /s/ Christina N. Goodrich

                                            Christina N. Goodrich (SBN 261722)
                                            christina.goodrich@klgates.com

                                            Zachary Timm (SBN 316564)
                                            zach.timm@klgates.com

                                            K&L Gates LLP
                                            10100 Santa Monica Boulevard, 8th Floor
                                            Los Angeles, California 90067
                                            Telephone:  +1 310.552.5000
                                            Facsimile:  +1 310.552.5001

                                            *Attorneys for Plaintiff CBRE, Inc.*

**COMPLAINT**

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff CBRE, Inc. hereby demands a trial by jury on every issue on which it is so entitled.

Dated:  October 23, 2019

Respectfully submitted,

K&L Gates LLP

By: /s/ Christina N. Goodrich

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com

Zachary Timm (SBN 316564)
zach.timm@klgates.com

K&L Gates LLP
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, California 90067
Telephone:  +1 310.552.5000
Facsimile:  +1 310.552.5001

*Attorneys for Plaintiff CBRE, Inc.*

**COMPLAINT**